## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**TGL GOLF HOLDINGS, LLC,**

*Plaintiff,*

v.

**LA GOLF PARTNERS, LLC,**

*Defendant.*

**Case No. 1:25-cv-00011-JDW**

### <u>MEMORANDUM</u>

TGL Golf Holdings, LLC ("TGL") was the first to file a lawsuit in this trademark dispute, so it has that going for it, "which is nice."[1] But "there's no such thing as a sure thing,"[2] and being the first to file, on its own, is not a good enough reason for me to exercise jurisdiction over this declaratory judgment action. On the contrary, TGL's race to the courthouse will prevent it from benefitting from the first-filed rule, and that same conduct weighs in favor of dismissing this lawsuit altogether. So, even though TGL served LA Golf Partners, LLC ("Golf Partners") with this declaratory judgment action before Golf Partners could file its own infringement action, Golf Partners does not have to "play it as

---

[1]   *Caddyshack* (Warner Brothers, 1980).
[2]   *Tin Cup* (Warner Brothers, 1996).

it lies."[3] I will instead decline to exercise jurisdiction over TGL's claims in this case and permit Golf Partners to pursue its claims as the natural plaintiff in this dispute.

## I.    RELEVANT BACKGROUND[4]

TGL is a virtual, interactive golf league that professional golfers, Tiger Woods and Rory McIlroy, and sports executive, Mike McCarley, created in partnership with the PGA Tour. TGL has six teams of PGA Tour players that compete in 18-hole matches on virtual golf courses. Players play the matches inside the SoFi Center in Palm Beach Gardens, Florida. One of the six teams is the Los Angeles Golf Club[5] (the "Golf Club"), and TGL holds trademarks related to that team, including stylized versions of the following: "Los Angeles Golf Club," "LAGC," and "LA Golf Club" (the "LAGC Marks"). It uses the LAGC Marks "in connection with its golf services and related products and services." (D.I. 1 at ¶ 30.) TGL claims that it licenses these marks to the Golf Club. TGL is a Delaware limited liability company with its headquarters in Winter Park, Florida.

Golf Partners is also a Delaware limited liability company, founded in 2018. It "manufactures and sells golf clubs, golf club shafts, and related products such as golf balls, putter covers, and putter grips." (*Id.* at ¶ 37.) It also sells LA Golf-branded clothing. Golf

---

[3]    *Happy Gilmore* (Universal Pictures, 1996).

[4]    My recitation of some of the facts tracks allegations set forth in TGL's Complaint, which are included for context only. I have not made any factual findings regarding any of the trademarks at issue in this case.

[5]    From what I can tell, the corporate entity appears to be LA Golf Club, Inc.

Partners holds trademarks for: "LAGP," "LA Golf Club," and "LA Golf." Its headquarters is in Anaheim, California.

On August 24, 2022, TGL announced its virtual league. At the time, it planned to launch the league in January 2024. On October 18, 2023, Golf Partners's counsel sent a letter to TGL and the Golf Club, accusing them of using trademarks that infringe Golf Partners's name and marks. Golf Partners sent the letter in an "attempt to open a dialogue that would allow the parties to reach a resolution and partnership, and avoid legal action" and suggested that the parties "engage in good faith negotiations to … resolve the matter." (D.I. 1-5 at 1, 3.) "In the months that followed, the parties' respective counsel had 2-3 discussions by telephone and videoconference to discuss LAGP's concerns. … The last of these conversations occurred on April 26, 2024[.]" (D.I. 1 at ¶ 41.)

Due to damage at the arena, TGL pushed back the launch of its competitions until January 7, 2025. In the lead up to the launch, TGL "invested substantial time, effort, and financial resources to promote and advertise its products sold under the LAGC Marks in interstate commerce and has engaged in extensive promotion of the LAGC team and its branding …." (*Id.* at ¶ 33.)

On the evening on January 3, 2025—the Friday before TGL's scheduled launch—Golf Partners's counsel sent a second letter to TGL and the Golf Club's counsel (the "Second Demand"). The Second Demand repeated Golf Partners's accusations of trademark infringement and stated that the "letter constitute[d] a final demand to cease and desist

from the intentional and damaging infringement" of Golf Partners's marks. (D.I. 1-6 at 1.) The letter explained that it had become necessary due to failed negotiations between the Parties and in light of TGL's imminent launch. The letter demanded that TGL and the Golf Club "confirm prior to January 7" that they would stop their alleged infringement. (*Id.*) The letter also made clear that Golf Partners had retained counsel "for the purposes of resolution of all disputes (including potential litigation)" relating to the trademarks (*id.*), and concluded with a threat of litigation, explaining that "LA Golf is prepared to continue to spend what it takes in each of these jurisdictions to protect its rights — for as long as it takes." (*Id.* at 3.) Golf Partners also explained that it would seek injunctive relief that would "severely limit TGL and the Golf Club ... if they cho[se] to continue down a path of obstinance and non-cooperation." (*Id.* at 4.)

On January 6, 2025, the Monday after receiving the Second Demand, TGL filed this lawsuit against Golf Partners pursuant to the Declaratory Judgment Act. In its Complaint, TGL seeks declarations of: (1) non-infringement under the Lanham Act; (2) no false designation of origin or unfair competition under the Lanham Act; (3) no dilution under the Lanham Act; (4) no unfair competition or deceptive trade practices under Delaware law; and (5) equitable estoppel prohibiting Golf Partners from enforcing any rights it may have; and it asks the Court to cancel Golf Partners's registration for "LA Golf Club." TGL served the lawsuit on Golf Partners January 9, 2025—just three days after it filed suit.

4

On January 30, 2025, Golf Partners filed its own lawsuit in the United States District Court for the Central District of California: *LA Golf Partners, LLC v. TGL Golf Holdings, LLC*, No. 2:25-cv-00816-WLH-JDE (C.D. Cal.) (the "California Action"). In its Complaint, Golf Partners asserts claims against TGL and LA Golf Club, Inc. for trademark infringement, unfair competition, false designation of origin, false association, false sponsorship, and false advertising in violation of the Lanham Act, as well as violations of California law. The case is assigned to Judge Wesley Hsu.

The same day Golf Partners filed the California Action, it moved to dismiss this case. In the alternative, Golf Partners asks that I transfer this matter to the Central District of California, where the California Action is pending. The motion is ripe for disposition.

## II.    LEGAL STANDARD

Under the Declaratory Judgment Act, "any court of the United States … *may* declare the rights and other legal relations of any interested party …." 28 U.S.C. § 2201(a) (emphasis added). The Supreme Court has held that the DJA's permissive language authorizes a district court, "in the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995).

## III.    ANALYSIS

### A.    First-Filed Rule

The first-filed rule "is a comity-based doctrine stating that, when duplicative lawsuits are filed successively in two different federal courts, the court where the action

was filed first has priority." *Chavez v. Dole Food Co., Inc.*, 836 F.3d 205, 210 (3d Cir. 2016). "Application of the rule is discretionary." *Id.* Accordingly, "courts have consistently recognized that the first-filed rule 'is not a rigid or inflexible rule to be mechanically applied[.]" *E.E.O.C. v. Univ. of Pennsylvania*, 850 F.2d 969, 976 (3d Cir. 1988), *aff'd*, 493 U.S. 182 (1990) (quotation omitted). "Although exceptions to the rule are rare," the presumption in favor of the first-filed forum may give way when the first-filing party has engaged in forum shopping or has "instituted suit in one forum in anticipation of the opposing party's imminent suit in another, less favorable, forum." *Id.* (citations omitted). Because TGL raced to file its declaratory judgment claims in this Court before Golf Partners could sue it in California, the first-filed rule is not a compelling reason to exercise jurisdiction over TGL's claims.

Based on the record before me, there is little doubt that TGL filed its lawsuit in anticipation of a suit by Golf Partners. "[A] suit is 'anticipatory' for the purposes of being an exception to the first-to-file rule if the plaintiff in the first-filed action filed suit on receipt of specific, concrete indications that a suit by the defendant was imminent." *Nexans Inc. v. Belden Inc.*, 966 F. Supp. 2d 396, 404 (D. Del. 2013) (quotation omitted). There is no question that: (1) Golf Partners's Second Demand threatened litigation, and (2) TGL interpreted the letter as such. Indeed, Golf Partners characterized its letter as a "***final*** demand" and advised TGL that it was willing to "spend what it takes ... to protect its rights." (D.I. 1-6 at 1, 3.) And TGL, itself, interpreted this letter as including "threats of trademark infringement." (D.I. 1 at

6

¶ 42.)[6] The letter—dated January 3, 2025—also makes clear that Golf Partners would escalate the dispute if TGL did not cease and desist its alleged infringement "*prior to* January 7." (D.I. 1-6 at 1 (emphasis added).) In other words, Golf Partners gave TGL just three days before it would resort to litigation. Thus, the Second Demand was a concrete indication that a trademark infringement suit was imminent.

Rather than wait to be sued in California—where Golf Partners is headquartered—TGL filed suit in this Court three days later, as "a Florida court would likely not have personal jurisdiction over [Golf Partners]." (D.I. 21 at 10.) Given the temporal proximity between TGL's receipt of the Second Demand and when it filed this lawsuit[7], there is no question that TGL raced to the courthouse (faster than Happy Gilmore chased a free Subway sandwich) in an effort to avoid litigating on Golf Partners's home turf. Other courts have reached similar conclusions when they confront similarly-short turnarounds from threats to filing of a declaratory judgment action. *See, e.g.*, *Excalibur Reinsurance Corp. v. Select Ins. Co.*, No. 15-cv-2522, 2015 WL 12806513, at *1 n.1 (E.D. Pa. July 7, 2015); *Telebrands Corp. v. martFIVE, LLC*, No. 13-cv-3374, 2013 WL 4675558, at *6 (D.N.J. Aug. 30, 2013); *Pittsburgh Logistics Sys., Inc. v. C.R. England, Inc.*, 669 F. Supp. 2d 613, 624 (W.D. Pa. 2009).

---

[6]    TGL repeats similar allegations throughout its Complaint. (*See* D.I. 1 at ¶¶ 8, 50, 52.)

[7]    Judges within the Third Circuit have also recognized that "a second-filing party may have a strong case that the initial filing is improper if the first-filing party initiated its suit within the response period provided in a recent cease-and-desist letter." *FMC Corp. v. AMVAC Chem. Corp.*, 379 F. Supp. 2d 733, 744 (E.D. Pa. 2005) (citing *Kim v. Kim*, 324 F. Supp. 2d 628, 636 (E.D. Pa. 2004)). Here, TGL filed suit on January 6, 2025—the deadline by which Golf Partners demanded confirmation that TGL stop its alleged infringement.

To the extent that TGL claims that business necessity drove its decision to sue, the facts undermine that explanation. If TGL wanted to get clarity about the scope of its rights, then it could have filed a declaratory judgment well in advance of the launch its business. At least as of October 18, 2023, TGL knew that Golf Partners believed that TGL was infringing its trademarks, yet TGL offers no plausible explanation for why it waited so long to file a declaratory judgment action. In addition, TGL could have responded to the Second Demand. It could have explained its position with respect both to validity and infringement. It could even have turned the tables on Golf Partners and explained that if Golf Partners did not give it a satisfactory response in a short period of time, then it would seek a declaratory judgment. The fact that it ran to the courthouse, and then raced to serve the suit, rather than engage in any continued dialogue, suggests that its goal was to win a race to a preferred courthouse, rather than just to get clarity for its business operations.

TGL's strategic decision to file suit when and where it did has consequences. Because TGL engaged in forum shopping with this anticipatory lawsuit, the first-filed rule does not apply in this case.

### B.    *Reifer* Factors

The fact that TGL engaged in forum shopping by filing an anticipatory lawsuit in this Court does not resolve the ultimate issue of whether I should exercise jurisdiction over TGL's DJA claims. Instead, it is just one of many factors I must consider. Relevant

here,[8] I must consider: "(1) the likelihood that a federal court declaration will resolve the uncertainty of obligation which gave rise to the controversy; (2) the convenience of the parties; (3) the public interest in settlement of the uncertainty of obligation; (4) the availability and relative convenience of other remedies; ... (6) avoidance of duplicative litigation; [and] (7) prevention of the use of the declaratory action as a method of procedural fencing or as a means to provide another forum in a race for res judicata[.]" *Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 146 (3d Cir. 2014). On balance, the scales tip in favor of declining jurisdiction over TGL's claims.

The convenience of the parties is the only factor that weighs in favor of continuing to exercise jurisdiction over this case, though it does not carry much weight. While California might be a more convenient location for Golf Partners, Golf Partners cannot complain about having to litigate in Delaware, where it chose to organize.[9] "[A]bsent some showing of a unique or unexpected burden, a company should not be successful in arguing that litigation in its state of incorporation is inconvenient." *ADE Corp. v. KLA-Tencor Corp.*, 138 F. Supp. 2d 565, 573 (D. Del. 2001). Golf Partners has not made such a showing. At the same time, however, TGL does not contend that it would be inconvenient

---

[8]    The Parties agree that the fifth and eighth *Reifer* factors have little relevance in this case, and I agree. Thus, I have not considered them as part of my analysis.

[9]    As TGL points out, Golf Partners expressed "its willingness to protect and defend its marks in the United States and throughout the world" and vowed to "continue to spend what it takes in each of these jurisdictions to protect its rights[.]" (D.I. 1-6 at 3.) Presumably, that includes litigating in Delaware.

for it to litigate its claims against Golf Partners in California. At most, it argues that "[t]raveling from Florida to Delaware is more convenient than California." (D.I. 21 at 15.) Even if that's true, it's not an overwhelming reason to keep the case here. And the remaining factors either support declining jurisdiction or are neutral, at best.

Though TGL's anticipatory filing and forum shopping is not dispositive, it is a significant factor for me to consider. "A declaratory action allows a party 'who is reasonably at legal risk because of an unresolved dispute, to obtain judicial resolution of that dispute without having to await the commencement of legal action by the other side.'" *Cisco Sys., Inc. v. Ramot at Tel Aviv Univ., Ltd.*, No. 21-cv-1365, 2022 WL 16921988, at *2 (D. Del. Nov. 14, 2022) (quotation omitted). Indeed, "the very purpose of [the DJA] is to ameliorate the dilemma" such uncertainty poses. *Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 201 (2014) (same). And "[i]n many cases, the declaratory defendant is prepared to, and does, file its own affirmative suit shortly afterwards." *IMS Health, Inc. v. Vality Tech. Inc.*, 59 F. Supp. 2d 454, 463 (E.D. Pa. 1999) (quotation omitted).

While "a district court cannot dismiss a proper declaratory action merely because affirmative infringement litigation is subsequently brought elsewhere[,] [i]t may ... dismiss the action where it is shown that the declaratory action was filed in anticipation of the impending litigation and motivated solely by considerations of forum shopping." *Id.* "Such a 'race to the courthouse' scenario demands particular scrutiny when[,] [as here,] the first-filed case is a declaratory judgment action filed by the party that would ordinarily be the

defendant in an analogous suit for coercive relief." *Ameritas Life Ins. Corp. v. Wells Fargo Bank, N.A.*, No. 21-cv-2136, 2022 WL 2168231, at *4 (D.N.J. June 16, 2022), *appeal denied, judgment aff'd*, 2022 WL 15442268 (D.N.J. Oct. 27, 2022). Courts "take a dim view" of such actions. *AmSouth Bank v. Dale*, 386 F.3d 763, 788 (6th Cir. 2004).[10] The DJA is meant to get legal clarity for litigants operating in a state of uncertainty, not to deprive a natural plaintiff of its preferred forum or to guarantee the declaratory plaintiff's own choice of venue. "Where a pending coercive action, filed by the natural plaintiff, would encompass all the issues in the declaratory judgment action, the policy reasons underlying the creation of the extraordinary remedy of declaratory judgment are not present, and the use of that remedy is unjustified." *Id.* at 787. That is the precise situation in this case.

Instead, the only reason TGL filed this lawsuit when it did (and without responding to the Second Demand) was to beat Golf Partners to the courthouse to try to deprive it of its choice of forum. But "where a putative defendant files a declaratory action whose only purpose is to defeat liability in a subsequent coercive suit, no real value is served by the declaratory judgment ...." *AmSouth Bank*, 386 F.3d at 788. Because TGL has engaged in forum shopping and used the DJA for procedural fencing, this factor weighs in favor of dismissal.

The desire to avoid duplicative litigation also weighs in favor of dismissing TGL's claims. TGL concedes as much, arguing that Golf Partners "filed the California Action to

---

[10]    *See Church & Dwight v. Mayer Lab'ys, Inc.*, No. 08-cv-5743, 2010 WL 3907038, at *4 (D.N.J. Sept. 28, 2010) (explaining that courts within the Third Circuit treat such anticipatory filings in a "serious manner").

tip this factor in its favor." (D.I. 21 at 7.) Maybe so. Or perhaps Golf Partners simply chose to pursue litigation where it had planned to file before TGL raced to file here. But it doesn't matter because the duplicative California Action could continue, regardless of whether I decide to exercise jurisdiction over TGL's claims. TGL contends that I can address the concern over duplicative litigation by "allowing this Action to proceed while staying or dismissing LAGP's duplicative case." (D.I. 21 at 8). Not so. Having determined that the first-filed rule does not apply in this instance, I would have no authority to stay or dismiss Golf Partners's claims in the California Action. *See E.E.O.C.*, 850 F.2d at 971. While Judge Hsu might stay or dismiss the claims in the California Action, there is no guarantee that he would do so. Instead, the only way to avoid duplicative litigation—for sure—is to dismiss this case.

The remaining *Reifer* factors all are neutral and, thus, do not lean towards keeping TGL's claims here. Primarily, there are two competing federal forums where both Parties can vindicate their respective rights in full. Either Golf Partners can assert its claims against TGL as counterclaims in this case (and also file a third-party complaint against the Golf Club), or TGL can assert its declaratory judgment claims as counterclaims in the California Action.[11] Thus, these factors are neutral. Likewise, both Parties are headquartered in places

---

[11]    Though both Parties assert a claim against each other arising under the respective forum state's law, nothing prevents the Parties from raising those claims elsewhere.

other than Delaware, so the public has minimal interest in having the Parties resolve their dispute here.

While it may be less convenient for TGL to litigate its claims against Golf Partners in California, that fact does not outweigh the more compelling obligations to avoid duplicative litigation and discourage litigants from using the DJA as a method of procedural fencing. Given those two significant factors, I will decline to exercise jurisdiction over TGL's claims.

## IV.    CONCLUSION

TGL raced to this courthouse to prevent Golf Partners from filing suit in its preferred forum in California. But the Declaratory Judgment Act is a vehicle for gaining clarity as to one's rights amidst indefinite uncertainty—not a strategic device to gain some perceived tactical advantage. Thus, I will decline to exercise jurisdiction over TGL's claims and dismiss this matter. An appropriate Order follows.

BY THE COURT:

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

June 9, 2025